# Exhibit B

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| Balanced Bridge Funding LLC fka Thrivest Specialty Funding LLC<br><br>Claimant<br><br>vs.<br><br>Mitnick Law Office, LLC<br><br>Respondent | Case No. 01-20-0005-1630<br><br>**OPINION** |

**Claimant's Counsel**       Eric C. Reed, Esquire

**Respondent's Counsel**   Craig R. Mitnick, Esquire

**AAA Director:**               Matthew Conger, Esquire

**Arbitrator:**                    Hon. Francis J. Orlando, Jr., A.J.S.C. *(Retired)*

---

Craig Mitnick, Esquire ("Mitnick") is an attorney and the principal of Mitnick Law Office, LLC ("Mitnick Law"). Mitnick Law represents over 1,250 former professional football players in the National Football League Concussion Class Action Litigation ("NFL Litigation"). In September 2015, Mitnick began selling its rights to attorney's fees earned in NFL Litigation to Balanced Bridge Funding LLC f/k/a Thrivest Specialty Funding ("Balanced"), a litigation funding company, in return for cash advances. Mitnick Law and Balanced entered into nine successive agreements. Balanced filed this arbitration claim contending that Mitnick Law breached the agreements by failing to pay over legal fees received in the litigation and refusing to update Balanced on the status of the litigation. Mitnick challenges the validity of the Agreements and seeks dismissal of Balanced claims. The parties have exchanged written discovery. Both parties have moved for Summary Judgment as to liability. Mitnick Law and Balanced each filed moving, opposition and supplemental Briefs and presented oral argument to the Arbitrator.

5944343-1

Case No. 01-20-0005-1630
**OPINION**

## BACKGROUND

Craig Mitnick is an experienced and accomplished civil and criminal litigator. Mitnick has personal and professional relationships with many retired NFL players throughout the United States. In December 2011, Mitnick learned about a possible class action lawsuit against the NFL for concussion related injuries suffered by players. Mitnick was retained by approximately 1,250 former players to represent them in the NFL Litigation. He was primary counsel for approximately 250 players and co-counsel with the Locks Law firm for another 1,000 players. Mitnick's efforts on behalf of the retired players received media coverage.

Joseph Genovesi ("Genovesi") is the CEO of Balanced. Genovesi contacted Mitnick in the summer of 2015 apparently to seek Mitnick's assistance in having Balanced provide case funding to players being represented by Mitnick in the NFL Litigation.

Mitnick contends that Genovesi proposed providing funding to Mitnick Law. According to Mitnick Genovesi "insisted that there was absolutely no risk to Mitnick's office as the transaction was "non-recourse." This meant that, if the Settlement did not materialize or the case did not pay out neither Mitnick nor his Office was liable to the Claimant" (Mitnick Certification paragraph 29).

Mitnick asserts that he had concerns about entering into an Agreement with a litigation funding company such as Balanced. However, it appears he never sought counsel or advice from an experienced transaction attorney.

Mitnick Law and Balanced executed the first agreement on or about September 24, 2015. The Agreement is titled "Assignment and Sale Agreement." The Agreement contains the following provisions.

Case No. 01-20-0005-1630<br>**OPINION**

WHEREAS, TSF is in the business of investing in settlement claims and lawsuits. This Sale Agreement specifically relates to TSF purchasing the right to receive a portion of the attorney contingency fees and attorney common benefit fees stemming from the final settlement of the matter of "In re NFL concussion litigation".

WHEREAS, Attorney/Seller confirms that he and/or his law firm is entitled to receive both legal fees from those individual cases for which he represents the interests of retired NFL players and where he is counsel and/or co-counsel, as well as common benefit fees approved/awarded by the court in regard to the class action matter;

WHEREAS, TSF wishes to purchase, and Attorney/Seller wishes to sell the right, title and interest in a portion of those legal fees already earned arising from the "NFL concussion class action" but not yet realized. This purchase is subject to the conditions set forth below;

WHEREAS, Attorney/Seller wishes to sell the right, title and interest in portion of his and/or his law firm's legal fees in the sum of Five Hundred Thousand dollars ($500,000.00) set forth in this Agreement (hereinafter referred to as "Purchased Price"). Attorney/Seller agrees to assign and sell such portion of their legal fees in exchange for the "purchase price."

Attorney/Seller sells and assigns to TSF all rights and interest in and to the first $770,000.00 (The Purchase Amount) of any amounts payable to Attorney/Seller or his firm related to the above Legal Action(s) free and clear of all claims, liens, interest, defenses, setoffs, and encumbrances. In return for the Purchase Amount, TSF will pay Attorney/Seller the Purchase Price. TSF and Attorney/Seller intend and agree that the transaction contemplated shall constitute a true sale and transfer of each Legal Fee to TSF, thereby providing TSF with the full risks and benefits ownership.

(emphasis added)

**Time of Payment to TSF – Receipt of Funds Repayment Amount**

Immediately upon receipt of any plaintiff contingency fees and/or class common benefit fees earned and/or awarded in connection with the NFL concussion class action, whether paid to Attorney/Seller by check, certified funds, and/or electronic bank transfers, Attorney/Seller agrees to provide TSF with notice of such receipt of funds, as well as a photo or electronic copy of the settlement check or wire transfer. Following receipt of such notice, TSF shall provide Attorney/Seller with the repayment amount as set forth in this agreement.

Attorney/Seller agrees to forward and pay to TSF the repayment amount no later than One (1) week after receipt of the funds referred to in clause (a) above.

In the event that the Attorney/Seller receives any fee in installments, Attorney/Seller agrees to forward and pay to TSF no later than One (1) week following receipt of each installment payment. Any partial payments received by Attorney/Seller shall be paid to TSF in full until such time as TSF has been paid the Purchase Amount in full.

The contract thus provides that Mitnick Law will receive $500,000.00 (purchase price) from Balanced (TSF). Mitnick Law, in return for this cash advance, sells and assigns to Balanced (TSF) the first $770,000.00 (purchase amount) that Mitnick Law receives as legal fees from the NFL Litigation. Mitnick Law is obligated to pay Balanced the legal fees it receives from the litigation within one week of receipt until the full $770,000.00 was paid.

Case No. 01-20-0005-1630
**OPINION**

The Assignment also contained the following Schedule B.

### Exhibit B

If no breach has occurred and TSF receives the full Purchase Amount by any of the following dates, TSF will pay to the Attorney/Seller the following additional consideration in the form of an increase in Purchase Price.

**TOTAL AMOUNT DUE, $770,000.00**
**9/21/15**

Rebate Amount if Repaid by

| Date | Amount |
|---|---|
| October 21, 2015 | $262,500.00 |
| November 21, 2015 | $255,000.00 |
| December 21, 2015 | $247,500.00 |
| January 21, 2016 | $240,000.00 |
| February 21, 2016 | $232,500.00 |
| March 21, 2016 | $225,000.00 |
| April 21, 2016 | $217,500.00 |
| May 21, 2016 | $210,000.00 |
| June 21, 2016 | $202,500.00 |
| July 21, 2016 | $195,000.00 |
| August 21, 2016 | $187,500.00 |
| September 21, 2016 | $180,000.00 |
| October 21, 2016 | $172,500.00 |
| November 21, 2016 | $165,000.00 |
| December 21, 2016 | $157,500.00 |
| January 21, 2017 | $150,000.00 |
| February 21, 2017 | $142,500.00 |
| March 21, 2017 | $135,000.00 |
| April 21, 2017 | $127,500.00 |
| May 21, 2017 | $120,000.00 |
| June 21, 2017 | $112,500.00 |
| July 21, 2017 | $105,000.00 |
| August 21, 2017 | $97,500.00 |
| September 21, 2017 | $90,000.00 |
| October 21, 2017 | $82,500.00 |
| November 21, 2017 | $75,000.00 |
| December 21, 2017 | $67,500.00 |
| January 21, 2018 | $60,000.00 |
| February 21, 2018 | $52,500.00 |
| March 21, 2018 | $45,000.00 |
| April 21, 2018 | $37,500.00 |
| May 21, 2018 | $30,000.00 |
| June 21, 2018 | $22,500.00 |
| July 21, 2018 | $15,000.00 |
| August 21, 2018 | $7,500.00 |
| September 21, 2018 | $0.00 |

*[signature]*, Eq.
MANAGING MEMBER
MITNICK LAW OFFICE, LLC.  9/24/15

5

According to Schedule B, Mitnick Law would receive increases in the Purchase Price if the Purchase Amount was received by the benchmarks set forth in the Schedule.

An Addendum to this Agreement memorialized an increase in the Purchase Price to a total of $900,000.00 and a corresponding increase in the Purchase Amount to $1,386,000.00. The Addendum contained a revised Schedule B setting forth increases in the Purchase Price Mitnick Law would receive if payment of the Purchase Price was received by the designated benchmarks.

### Exhibit B

If no breach has occurred and TSF receives the full Purchase Amount by any of the following dates, TSF will pay to the Attorney/Seller the following additional consideration in the form of an increase in Purchase Price.

**TOTAL AMOUNT DUE $1,386,000.00**
**12/31/15**

Rebate Amount if Repaid by

| Date | Amount |
|---|---|
| December 31, 2015 | $472,500.00 |
| January 31, 2016 | $459,000.00 |
| February 29, 2016 | $445,500.00 |
| March 31, 2016 | $432,000.00 |
| April 30, 2016 | $418,500.00 |
| May 31, 2016 | $405,000.00 |
| June 30, 2016 | $391,500.00 |
| July 31, 2016 | $378,000.00 |
| August 31, 2016 | $364,500.00 |
| September 30, 2016 | $351,000.00 |
| October 31, 2016 | $337,500.00 |
| November 30, 2016 | $324,000.00 |
| December 31, 2016 | $310,500.00 |
| January 31, 2017 | $297,000.00 |
| February 28, 2017 | $283,500.00 |
| March 31, 2017 | $270,000.00 |
| April 30, 2017 | $256,500.00 |
| May 31, 2017 | $243,000.00 |
| June 30, 2017 | $229,500.00 |
| July 31, 2017 | $216,000.00 |
| August 31, 2017 | $202,500.00 |
| September 30, 2017 | $189,000.00 |
| October 31, 2017 | $175,500.00 |
| November 30, 2017 | $162,000.00 |
| December 31, 2017 | $148,500.00 |
| January 31, 2018 | $135,000.00 |
| February 28, 2018 | $121,500.00 |
| March 31, 2018 | $108,000.00 |
| April 30, 2018 | $94,500.00 |
| May 31, 2018 | $81,000.00 |
| June 30, 2018 | $67,500.00 |
| July 31, 2018 | $54,000.00 |
| August 31, 2018 | $40,500.00 |
| September 30, 2018 | $27,000.00 |
| October 31, 2018 | $13,500.00 |
| November 30, 2018 | $0.00 |

5944343-1

The next Agreement executed by the parties' states that the Purchase Price i.e. cash advanced to Mitnick Law is $1,097,592.78. However, there is no Purchase Amount set forth. Instead, Mitnick Law is required to make payments according to a Scheduled attached to the Agreement.

The Schedule of Payments is as follows:

**SCHEDULE I**

Schedule of Payments

| Date | Amount |
|---|---|
| June 30, 2016 | $1,114,971.33 |
| July 31, 2016 | $1,132,625.05 |
| August 31, 2016 | $1,150,558.27 |
| September 30, 2016 | $1,168,775.45 |
| October 31, 2016 | $1,187,281.06 |
| November 30, 2016 | $1,206,079.68 |
| December 31, 2016 | $1,225,175.94 |
| January 31, 2017 | $1,244,574.56 |
| February 28, 2017 | $1,264,280.32 |
| March 31, 2017 | $1,284,298.09 |
| April 30, 2017 | $1,304,632.81 |
| May 31, 2017 | $1,325,289.50 |
| June 30, 2017 | $1,346,273.25 |
| July 31, 2017 | $1,367,589.24 |
| August 31, 2017 | $1,389,242.74 |
| September 30, 2017 | $1,411,239.08 |
| October 31, 2017 | $1,433,583.70 |
| November 30, 2017 | $1,456,282.11 |
| December 31, 2017 | $1,479,339.91 |
| January 31, 2018 | $1,502,762.79 |
| February 28, 2018 | $1,526,556.53 |
| March 31, 2018 | $1,550,727.01 |
| April 30, 2018 | $1,575,280.19 |
| May 31, 2018 | $1,600,222.13 |
| June 30, 2018 | $1,625,558.98 |
| July 31, 2018 | $1,651,296.99 |
| August 31, 2018 | $1,677,442.53 |
| September 30, 2018 | $1,704,002.04 |
| October 31, 2018 | $1,730,982.07 |
| November 30, 2018 | $1,758,389.29 |
| December 31, 2018 | $1,786,230.45 |
| January 31, 2019 | $1,814,512.43 |
| February 28, 2019 | $1,843,242.21 |
| March 31, 2019 | $1,872,426.88 |
| April 30, 2018 | $1,902,073.64 |
| May 31, 2018 | $1,932,189.80 |

Moreover, there is no provision for additional increases to the Purchase Price in the event of timely payment of the Purchase Amount as was set forth in the two Exhibit B's attached to the original Agreement and the Addendum to it.

The parties ultimately entered into an Agreement dated June 2, 2017 described as a "Master Agreement with respect to all transactions concerning the Seller's sale of Legal Fee." The title to the Agreement is:

**MASTER NON-RECOURSE PURCHASE AND SALE AGREEMENT**
**(ATTORNEYS' FEES)**

Significant provisions of this "Master Non-Recourse Purchase and Sale Agreement" include the following:

1. **Purchase Price; Sale and Assignment; and Consideration**

    (a) Seller hereby sells, transfers and assigns to Purchaser all or a portion of its legal and beneficial right, title and interest, free and clear of all claims, liens, interest, defenses, setoffs, and encumbrances, in and to the Legal Fees.

    (b) Purchaser shall pay to the Seller in respect of the Legal Fees the amount set forth in the Rider (the "Purchase Price").

    (c) In consideration of the Purchase Price, Seller agrees to pay to the Purchaser the scheduled amount (the "Scheduled Payments") as set forth in Exhibit B to the Rider.

    (d) The Seller shall collect the Legal Fees when due and payable until the Scheduled Payments are paid in full. Within three (3) days after Seller's collection and receipt of such Legal Fees, Seller shall distribute or cause to be distributed to Purchaser all Legal Fees prior to any costs or expenses incurred by the Seller in connection with its collection of such Legal Fees. Seller shall hold the Legal Fees in trust for the Purchaser.

    (e) Notwithstanding anything to the contrary stated herein, upon payment in full of all of the Scheduled Payments by Seller, all obligations of the Seller hereunder shall be satisfied.

Case No. 01-20-0005-1630
**OPINION**

2. **True Sale; Not a Loan**

Seller intends and agrees that the transaction contemplated in this Agreement shall constitute a true sale and transfer to Purchaser of the Legal Fees.

    (a)    Seller agrees and understands that any funds received in respect of the Legal Fees shall be paid to Purchaser with no other disbursements being made until Seller's obligations to Purchaser hereunder have been fully satisfied.

    (e)    Upon the request of Purchaser, Seller shall provide Purchaser with updates, including status changes and related documentation, if any, in respect of the Lawsuit.

8. **Events of Default**

    Any of the following events shall be deemed to be an event of default under this Agreement (each an "Event of Default").

    (a)    Default in the payment when due of any of the payments that represent the Scheduled Payments.

10. **Cross Default; Cross Collateral**

Seller hereby agrees that (a) an Event of Default under this Agreement is a default or an Event of Default under any other non-recourse purchase and sale agreements between Seller and Purchaser and a default under any such non-recourse purchase and sale agreements is a default hereunder and (b) the Legal Fees shall secure all of Seller's obligations under each of such now existing or hereafter outstanding non-recourse purchase and sale agreements and the legal fees sold to Purchaser by the Seller under any of such non-recourse purchase and sale agreements secures all of Seller's obligations to the Purchaser under this Agreement.

9

## EXHIBIT B

## Schedule of Payments

| | | | |
|---|---|---|---|
| June 30, 2017 | $2,223,937.20 | December 31, 2018 | $2,950,711.79 |
| July 31, 2017 | $2,259,149.54 | January 31, 2019 | $2,997,431.39 |
| August 31, 2017 | $2,294,919.41 | February 28, 2019 | $3,044,890.72 |
| September 30, 2017 | $2,331,255.63 | March 31, 2019 | $3,093,101.49 |
| October 31, 2017 | $2,368,167.18 | April 30, 2019 | $3,142,075.60 |
| November 30, 2017 | $2,405,663.16 | May 31, 2019 | $3,191,825.13 |
| December 31, 2017 | $2,443,752.83 | June 30, 2019 | $3,242,362.36 |
| January 31, 2018 | $2,482,445.58 | July 31, 2019 | $3,293,699.76 |
| February 28, 2018 | $2,521,750.97 | August 31, 2019 | $3,345,850.01 |
| March 31, 2018 | $2,561,678.69 | September 30, 2019 | $3,398,825.97 |
| April 30, 2018 | $2,602,238.60 | October 31, 2019 | $3,452,640.71 |
| May 31, 2018 | $2,643,440.71 | November 30, 2019 | $3,507,307.52 |
| June 30, 2018 | $2,685,295.19 | December 31, 2019 | $3,562,839.89 |
| July 31, 2018 | $2,727,812.37 | January 31, 2020 | $3,619,251.53 |
| August 31, 2018 | $2,771,002.73 | February 29, 2020 | $3,676,556.34 |
| September 30, 2018 | $2,814,876.94 | March 31, 2020 | $3,734,768.48 |
| October 31, 2018 | $2,859,445.82 | April 20, 2020 | $3,793,902.32 |
| November 30, 2018 | $2,904,720.38 | May 31, 2020 | $3,853,972.44 |

With my signature below, I acknowledge and understand if distribution of the Scheduled Payments has not been paid to TSF by the last date of the above Schedule of Payments, the Scheduled Payments will continue to accrue at the same rate as described in the Purchase and Sale Agreement until distribution occurs.

_____
Mitnick Law Office, LLC

RIDER No. 2

RIDER No. 2 TO MASTER NON- RECOURSE PURCHASE AND SALE AGREEMENT
DATED APRIL 23, 2018
(ATTORNEYS' FEES)

Rider No. 2 dated as of April 23, 2018 to that certain Master Non-Recourse Purchase and Sale Agreement dated as of June 2, 2017 between Mitnick Law Office, LLC and Thrivest Specialty Funding, LLC (the "Master Agreement")

Reference is hereby made to that certain Master Agreement between Mitnick Law Office, LLC (the "Seller") and Thrivest Specialty Funding, LLC (the "Purchaser") and dated as of June 2, 2017. All capitalized terms not otherwise defined in this Rider No. 2 shall have the same meanings as ascribed to them in the Master Agreement. All terms and conditions of the Master Agreement are hereby incorporated herein by reference as if they were fully set forth in this Rider No. 2.

Reference is hereby made to that certain Rider dated June 2, 2017 ("Prior Rider"), whereby the Purchaser advanced the sum of $2,189,873.70 to the Seller. The amounts advanced to the Seller under this Rider are in addition to those amounts advanced in the Prior Rider.

1. Seller hereby acknowledges and understands and agrees that it shall be subject to all of the terms and conditions as set forth in the Master Agreement including but not limited to Seller's agreement to pay the Scheduled Payments (described on Exhibit B hereto) to the Purchaser. Moreover, Seller agrees that as a condition to the Purchaser paying the Purchase Price to the Seller, Seller must obtain the signature of the Obligor on the Irrevocable Authorization, Agreement and Acknowledge to Pay, the form of which is attached hereto as Exhibit A.

2. Seller agrees that Purchaser may deduct the Transaction Fees in the amount set forth below in this Rider No. 2 from the Purchase Price.

**Description of Legal Fees**: United States District Court for the Eastern District of Pennsylvania - In RE: National Football League Player's Concussion Injury Litigation; Docket No: 2:12-md-02323-AB; MDL No. 2323; Civ. Action No.:14-cv-00029-AB.

**Scheduled Payments** (*Purchase Price plus an annual investment return of 19% accruing and compounded monthly*): See Exhibit B attached hereto and made a part hereof.

**Purchase Price:**       $515,463.92

**Transaction Fees:**    $ 15,463.92

**Amounts Withheld:**   $       0.00

**Net to Attorney:**      $500,000.00

11

cc: Thrivest Specialty Funding, LLC

EXHIBIT B

Description of Scheduled Payments

| Date | Amount | Date | Amount |
|---|---|---|---|
| April 30, 2018 | $523,625.43 | October 31, 2019 | $694,744.32 |
| May 31, 2018 | $531,916.17 | November 30, 2019 | $705,744.44 |
| June 30, 2018 | $540,338.17 | December 31, 2019 | $716,918.72 |
| July 31, 2018 | $548,893.53 | January 31, 2020 | $728,269.94 |
| August 31, 2018 | $557,584.34 | February 29, 2020 | $739,800.88 |
| September 30, 2018 | $566,412.76 | March 31, 2020 | $751,514.39 |
| October 31, 2018 | $575,380.96 | April 30, 2020 | $763,413.37 |
| November 30, 2018 | $584,491.16 | May 31, 2020 | $775,500.75 |
| December 31, 2018 | $593,745.61 | June 30, 2020 | $787,779.51 |
| January 31, 2019 | $603,146.58 | July 31, 2020 | $800,252.69 |
| February 28, 2019 | $612,696.40 | August 31, 2020 | $812,923.35 |
| March 31, 2019 | $622,397.42 | September 30, 2020 | $825,794.64 |
| April 30, 2019 | $632,252.05 | October 31, 2020 | $838,869.72 |
| May 31, 2019 | $642,262.71 | November 30, 2020 | $852,151.82 |
| June 30, 2019 | $652,431.87 | December 31, 2020 | $865,644.23 |
| July 31, 2019 | $662,762.04 | January 31, 2021 | $879,350.26 |
| August 31, 2019 | $673,255.77 | February 28, 2021 | $893,273.31 |
| September 30, 2019 | $683,915.65 | March 31, 2021 | $907,416.80 |

With my signature below, I acknowledge and understand if distribution of the Scheduled Payments has not been paid to TSF by the last date of the above Schedule of Payments, the Scheduled Payments will continue to accrue at the same rate as described in the Purchase and Sale Agreement until distribution occurs.

Mitnick Law Office, LLC

MATTHEW COWPERTHWAIT
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 11/18/2018

Case No. 01-20-0005-1630
**OPINION**

With respect to the Schedule of Payments attached to the Master Agreement Mitnick states the "Schedule of payments did not concern me since it was described as requiring payment only in the event that payout on the Settlement was not achieved by May 31, 2020. (Mitnick Brief p.8) Mitnick makes a similar statement with respect to the payment schedule attached as Rider 2 of the Master Agreement dated April 25, 2018. He states that the "outside date was so far away and certainly Settlement Funds would be in by that time."

Mitnick Law received between $2,150,000.00 (according to Mitnick) and $2,208,194.06 (according to Balanced) cash advances from Balanced from September 2015 through April 2018. Mitnick Law was dealt several setbacks with respect to its anticipated Legal Fees from the NFL litigation. Mitnick Law anticipated receiving between 5 to 10 million dollars in common benefit legal fees. This would have enabled Mitnick to pay off Balanced and have several million dollars for the firm. Mitnick Law, however, was only awarded $700,000.00. Second, the trial court judge reduced the contingent fees of attorneys representing the players from $33\frac{1}{3}\%$ to 17%. Third, the Court ordered a 5% hold back from each award.

When Mitnick Law began receiving Legal fees it forwarded them to Balanced. Between July 2018 and March 2019 Mitnick Law made the following payments to Balanced:

| 07-31-18 | $673,959.38 |
| 08-17-18 | $558,166.00 |
| 08-30-18 | $400,000.00 |
| 09-17-18 | $90,766.34 |
| 09-24-18 | $790.17 |
| 12-27-18 | $55,546.00 |
| 03-18-19 | $90,500.00 |

13

Case No. 01-20-0005-1630<br>**OPINION**

In all, Mitnick Law has repaid to Balanced between $1,850,000.00 (according to Mitnick) and $1,869,727.89 (according to Balanced).

Mitnick Law admits that it has stopped paying Balanced fees it has received in the NFL Litigation. Mitnick Law says it did so after Genovesi advised Mitnick that the funding Agreements remain in effect for as long as the NFL Settlement remained in effect and after Mitnick's accountant advised him of the financing charges.

The Agreements require Mitnick Law to turn over legal fees received from NFL Litigation to Balanced until its obligations have been satisfied. Mitnick has not as yet repaid all the cash advances received let alone any interest. Thus, there is an admitted breach. The issue to be resolved is are the agreements valid and binding.

## ANALYSIS

I.  ARE THE AGREEMENTS NON-RECOURSE CONTRACTS

Balanced asserts that the Agreements between it and Mitnick Law are non-recourse contracts "in that Mitnick Law has no payment obligation if it does not receive payment in the NFL Concussion Class Action settlement program". (Balanced Brief, p.2). Balanced in its opposition Brief similarly states "if Mitnick Law receives legal fees from NFL concussion cases it is obligated to report and pay them over to Balanced Bridge per the repayment schedule in the agreement. No such liability attaches absent Mitnick Law's receipt of such legal fees". (Opposition Brief, p.7) Balanced further declares in its Supplemental Brief that Mitnick Law's payment obligation is limited to receipt of payment on NFL concussion cases. (Supplemental Brief, p.4)

14

Case No. 01-20-0005-1630
**OPINION**

Mitnick Law in its moving Brief argues that there is an inconsistency in the Agreements as to whether the contracts are non-recourse. Mitnick Law acknowledges that the Title to the Master Agreement includes the term Non-Recourse. However, Mitnick Law asserts that the Agreement describes a default as the failure to make a payment when due of any of the payments that represent the Scheduled Payments. In the event of such a default Mitnick Law contends the Agreement renders Mitnick Law liable for all scheduled payments plus damages. Mitnick Law thus argues that the obligation to make payments in accordance with the Schedule and the remedies available upon failure to do so are inconsistent with a non-recourse contract. Therefore, according Mitnick Law this inconsistency renders the Agreements unenforceable.

The task of a tribunal in interpreting a contract is to ascertain the intent of the parties from the terms used in the document and the parties course of conduct Restatement (Second) of Contracts Section 202.

The relationship between Balanced and Mitnick Law discloses the following:

1. The first agreement between the parties limited Mitnick Law's obligation to repay $770,000.00 solely from the legal fees it received from in the NFL litigation. This was clearly a non-recourse contract.

2. The first agreement between the parties which included a Schedule of payments lists approximately 24 payments which came due before Mitnick Law received its first fees from the NFL Litigation. Balanced never sought to default Mitnick Law for failing to make any of the payments set forth in the schedule.

3. The Title to Master Agreement is "Master Non-Recourse Purchase and Sale Agreement (Attorneys' Fees)."

4. The Master Agreement includes paragraph 10 which refers to the agreements between the parties as non-recourse purchase and sale agreements and states "the legal fees sold to Purchaser by the Seller under any of such non-recourse purchase and sale agreements secures all of Seller's obligations to the Purchaser under this Agreement."

15

     5.    Mitnick Law itself describes Paragraph 10 in the agreement "is in accord with the plain title of the Master Agreement and in keeping with the Claimant's representations and the Respondents' understanding." (Mitnick Law's Supplement Brief, p.4)

The foregoing demonstrates that the agreements between the parties are non-recourse contracts which limit Mitnick Law's payment obligation to receipt of legal fees from NFL concussion cases. The fact that Balanced never sought to default Mitnick Law for failing to make a payment in accordance with the schedule demonstrates the validity of Claimant's argument that the payment schedule is a "projection tool showing total payment obligations at different points in time assuming Mitnick Law's receipts supported those amounts and that Mitnick Law had not made prior payments." (Balanced's Supplement Brief, p.4)

Thus, the provisions in the Agreements made clear through the language used and the parties conduct establish non-recourse contracts.

II.    NON-RECOURSE CONTRACT ARE PERMISSIBLE IN LEGAL FUNDING CASES

The Third Circuit in <u>Obermayer, Rebmann, Maxwell & Hippel v. West</u>, No. 16-1376, 2018 WL 1074310 at 2 (3d Cir. Feb. 27, 2018) ruled that a contract for funding pending the resolution of litigation is enforceable. <u>Obermayer</u> represented <u>West</u> in a suit against Reed Smith for alleged malpractice. During the course of the litigation <u>West</u> on several occasions received funds from the litigation funder Fast Trak. The Agreements between <u>West</u> and Fast Trak stated that the contracts were non-recourse because there was no obligation for <u>West</u> to make payments except from the proceeds of the Reed Smith litigation. <u>West</u> received $164,000.00 from Fast Trak. When the Reed Smith case settled Fast Trak sent <u>West</u> a payoff letter stating he owed $373,885.00 from the settlement proceeds. <u>West</u> balked at paying claiming the underlying agreements were

unenforceable as usurious. The Third Circuit disagreed. The Court stated that the transactions in question were not loans subject to usury law because Fast Traks' right to repayment was contingent on the success of the Reed Smith suit.

In the instant case it has already been established that the agreements between Balanced and Mitnick Law are non-recourse contracts contingent on Mitnick Law's receipt of fees from the NFL Litigation. The contingent nature of the contracts makes the agreements enforceable.

III.   MITNICK LAW'S CHALLENGES TO THE AGREEMENTS FAIL

A.   THE AGREEMENTS ARE NOT CHAMPERTOUS

Mitnick Law's effort to characterize the Agreements in question as champertous fails. Champerty is a "bargain between a stranger and a party to a lawsuit by which the stranger pursues the party's claim in a consideration of receiving part of any judgment proceeds." Riffin v. Consolidated Rail Corp., 363 F. Supp.3d 569 (E.D. Pa 2019). An assignment is champertous where the party involved has no interest in the litigation, expends his own money to prosecute the suit and is entitled to a portion of the proceeds received from the litigation. Frank v. Tewinkle, 45 A.3d 434 (Pa. Super. 2012).

In the case at bar the champerty doctrine does not apply because Balanced did not take an assignment of claims in the underlying cases nor did it pursue any of the claims in the NFL Litigation. Balanced purchased Mitnick Law's rights to counsel fees if such fees were awarded, it did not prosecute any case. Furthermore, Balanced did not fund any particular case. Balanced advanced funds to enable Mitnick Law to continue the firm's general operations.

B.  MITNICK LAW DOES NOT IDENTIFY FALSE REPRESENTATIONS NEEDED TO ESTABLISH FRAUD

Mitnick Law appears to argue that the agreements are the product of fraud because Genovesi represented that the contracts were non-recourse which Mitnick Law states is "simply erroneous." However, this opinion has already established that the agreements are indeed non-recourse contracts in which Mitnick Law's obligation to repay is predicated upon its receipt of fees from the NFL Litigation. Moreover, as I noted earlier in this opinion Mitnick's Law states that the Title to the Master Agreement and Paragraph 10 reflect Balanced representations and Mitnick Law's understanding about the nature of the agreements. Mitnick Law's claim of fraud based on its contention that Genovesi misrepresented the agreements as non-recourse is not accurate. The agreements, are as Genovesi stated, non-recourse.

IV.  THERE IS NO SUPPORT IN THE RECORD FOR MITNICK LAW'S CONTENTION THAT THE ARGREEMENTS ARE UNCONSCIONABLE

Mitnick Law once again asserts that the Agreements must be set aside because the Agreements were represented to be non-recourse and they are not. Mitnick Law is wrong. The Agreements are non-recourse. Thus, there is no basis for its argument of unconscionability.

Case No. 01-20-0005-1630
**OPINION**

## SUMMARY

The fees Mitnick Law anticipated receiving in the NFL Litigation have not been in the amounts the firm anticipated. This may be a factor in its challenge to the Agreements. However, a review of the Agreements and an examination of Mitnick Law's challenges demonstrates that the Agreements are valid. Mitnick Law has admitted breach. Therefore, Balanced's application for Summary Judgment as to liability is granted. Mitnick Law's application to dismiss the claim is denied.

## DAMAGE HEARING

This case is listed for a Damage Hearing on June 8 and 9, 2021. Among the items to be addressed are:

1. Exhibit B to the First Addendum established Mitnick Law's obligation as $1,386,000.00. The schedule provides that if this obligation is paid by August 31, 2018 Mitnick Law is to receive $40,500 increase in purchase price. It appears that Mitnick paid that amount by August 30, 2018. Have these payments and rebate been factored into Mitnick Law's obligation?

2. The Schedule of Payments refers to a rate described in the Purchase and Sale Agreement. What is the rate and where is it to be found?

Dated: May 27, 2021

_____
Francis J. Orlando, Jr., Arbitrator

19

5944343-1